806 F.2d 24
 Richard Thomas PATTON, Plaintiff-Appellant,
v.
Elizabeth DOLE, Secretary of Transportation, Admiral Thomas
King, Superintendent of the United States Merchant Marine
Academy, Casper Weinberger, Secretary of Defense, John
Lehman, Secretary of the Navy, United States Merchant Marine
Academy and the United States of America, Defendants-Appellees.
 No. 1657, Docket 86-6124.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 13, 1986.
Decided Nov. 19, 1986.
 
 Robert W. Nishman, Mineola, N.Y., for plaintiff-appellant.
 Robin Greenwald, Brooklyn, N.Y., Atty. in Charge (Andrew J. Maloney, U.S. Atty., of counsel), for defendants-appellees.
 Before PRATT and MINER, Circuit Judges, and RE, Chief Judge of the United States Court of International Trade, sitting by designation.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 Both statute and implementing regulations relevant to this appeal require a midshipman at the United States Merchant Marine Academy at Kings Point, New York (the "academy"), who resigns after having attended the academy "for not less than 2 years", to go on active duty in the United States Navy. The statutory language is incorporated into the service obligation agreement the midshipman must execute upon entering the academy; both use the term "2 years". The issue on appeal is whether "2 years" means two academic years or two calendar years.
 
 
 2
 Contending that "2 years" in his service obligation agreement means two academic years, Richard Thomas Patton sought preliminarily to enjoin defendants, including the academy and the Secretaries of Transportation, Defense, and the Navy, from compelling his involuntary induction into the navy following his voluntary resignation from the academy shortly before he was about to complete his second academic year. Apparently accepting the government's argument that "2 years" means two calendar years, the district court not only denied Patton's application for preliminary injunctive relief, but also, sua sponte, ordered dismissal of the complaint. In both respects the district court erred; we therefore reverse and remand the case to the district court with directions to reinstate the complaint, to issue the preliminary injunction, and to conduct such further proceedings as may be appropriate.
 
 BACKGROUND
 
 3
 In signing an application for admission to the academy, a prospective midshipman states his or her understanding that he or she "must sign a service agreement form, as outlined in the catalog, on the date I report to the Academy". The terms of the service obligation agreement are derived from 46 U.S.C. Sec. 1295b(e)(1) and 46 C.F.R. Sec. 310.58(a). Among other things, that agreement obligates each midshipman who is a citizen of the United States to complete the four-year course of instruction at the academy, and provides, in paragraph 1(j), that
 
 
 4
 [i]f the Secretary of Transportation determines that any individual who has attended the [Academy] for not less than two (2) years has failed to fulfill the [requirement relating to completion of the course of instruction], such individual may be ordered by the Secretary of the Navy to active duty in the United States Navy to serve in an enlisted status for a period of time not to exceed two (2) years. In cases of hardship, as determined by the Secretary of Transportation, this paragraph may be waived; ...
 
 
 5
 Appendix to Appellant's Brief, Exhibit A. This language is taken from 46 U.S.C. Sec. 1295b(e)(2) and 46 C.F.R. Sec. 310.58(e)(1).
 
 
 6
 Does the term "2 years" refer to academic or calendar years? From the only evidence in the record it appears that the academy, at least until this case arose, consistently represented the term to refer to academic years. In both the academy's bulletin and catalog, the following statements, tying the two-year period to academic years, appear immediately after the paragraph 1(j) provision:
 
 
 7
 The following policies apply to midshipmen who enter the U.S. Merchant Marine Academy from a civilian status:
 
 
 8
 Fourth and Third Classmen (freshmen and sophomores): Any Fourth or Third Classman who is separated, or whose resignation is accepted, will be discharged from the Naval Reserve.
 
 
 9
 Second and First Classmen (juniors and seniors): Such a midshipman who fails to complete the course of instruction at the Academy, unless the individual is separated by the Academy, may be ordered by the Secretary of the Navy to serve in an enlisted status for a period of time not to exceed two years. In case of hardship, the Secretary of Transportation may waive this requirement.
 
 
 10
 Moreover, the academy's application form states "that a Midshipman in the junior or senior year * * * who breaches the agreement may be called to active duty in a uniformed service of the United States".
 
 
 11
 When Patton enrolled in the academy in June 1982, he and his fellow fourth classmen, or "plebes", attended a two-week indoctrination session, during which the plebes were required to sign their service obligation agreements. See 46 C.F.R. Sec. 310.52(b) (1985); id. Sec. 310.57(d). To facilitate their signing, the academy conducted a contract-signing session. According to the sworn affidavits of Patton and two of his former classmates, the paragraph 1(j) provision was specifically discussed at that session. Officers of the academy's Department of Naval Science read the contracts aloud to the plebes and interpreted the Sec. 1295b(e)(2) language as providing that a midshipman could, at any time before commencing his second-class, or junior, year, voluntarily resign from the academy without incurring any service obligation.
 
 
 12
 Patton commenced his first academic year in late July 1982 and completed it in good standing in early June 1983. After a two-week break, he began his required six-month semester at sea. Generally, midshipmen spend the first two quarters of their sophomore and junior years at sea aboard merchant vessels. See 46 C.F.R. Sec. 310.59(b) (1985). Upon conclusion of each six-month sea experience, they are required to complete written study assignments incorporating material from the academy's academic curriculum. See id. Because Patton failed to complete his sea reports, the superintendent of the academy ordered that he be set back one academic year to the graduating class of 1987 and that he be suspended and sent home following completion of the third quarter of his sophomore year in April 1984.
 
 
 13
 Patton returned to the academy in July 1984 and repeated his sophomore sea experience. Without completing his sophomore year, he resigned from the academy in January 1985, citing personal reasons and believing he was not obligated to any naval service.
 
 
 14
 On January 29, 1985, however, Patton received from the superintendent a notification that because two and one-half calendar years had elapsed since he entered the academy, he would be nominated for involuntary active duty in the navy. The recommendation of the Naval Science Department that Patton go on involuntary active duty for a period not to exceed two years was approved by the Secretary of the Navy, and Patton was ordered to report for a physical examination on June 22, 1986. If found physically qualified, Patton would have immediately begun his two years of involuntary active duty. At that point, Patton retained counsel and commenced this action, seeking both injunctive relief and a declaratory judgment that he should be reinstated as a midshipman at the academy. The parties have agreed to stay Patton's induction pending disposition of this appeal.
 
 
 15
 In support of his application for a preliminary injunction, Patton tendered affidavits by himself and two of his former classmates. Although defendants appeared in opposition to plaintiff's application, they presented no answering papers of any kind.
 
 
 16
 A fair reading of the transcript of the hearing conducted on June 30, 1986, reveals a strong predisposition by the district court to deny Patton any relief. In reference to Patton, the lower court stated, "Show me a service man who doesn't know what he is getting into, and I will show you a guy who is not telling the truth." Rather than review the affidavits offered by Patton, the district court focused instead on the fact that Patton had to repeat his sophomore year due to his own indiscretions, stating that "[t]hese young people today know everything about what is happening from standing on the street corner and discussing it. They know how the Government would operate when it comes to them."
 
 
 17
 The Assistant United States Attorney ("AUSA") representing the defendants centered her oral argument around the district court's earlier mischaracterization of Patton's claim as one for rescission based on duress. Additionally, the AUSA stated that the contract language at issue was not ambiguous, adding, without record support, that she had "spoken to the person who gives them the contract and he [said] they are told two years, nothing in there saying junior year." In response to this hearsay statement--the only "evidence" offered by defendants--the district court stated, "I agree with that."
 
 
 18
 At the conclusion of the argument and without making any specific findings, the district court denied Patton's application from the bench. In a formal order signed later that day, the court also ordered sua sponte dismissal of the complaint and entry of judgment for defendants.
 
 
 19
 For reasons that follow, we reverse the decision below, finding the denial of preliminary injunctive relief and dismissal of the complaint to be clear abuses of discretion.
 
 DISCUSSION
 
 20
 A. The Preliminary Injunction.
 
 
 21
 We recognize that preliminary injunctive relief is an extraordinary remedy and should not be routinely granted, Medical Society of the State of New York v. Toia, 560 F.2d 535, 538 (2d Cir.1977), that the decision whether to grant or deny it lies within the sound discretion of the district court judge, Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc., 754 F.2d 91, 95 (2d Cir.1985), and that we may ordinarily disturb the determination below only if we find it constitutes an abuse of discretion, id.
 
 
 22
 In reviewing this appeal, since the district court made no detailed findings in support of its denial of Patton's application, we are left only with the district court's comments at the hearing, but even they do not reveal a legal basis for the denial. While district courts are required to set forth reasons only when granting an injunction, see Fed.R.Civ.P. 65(d), we have held that if a district court makes no detailed findings in denying an injunction, we must engage in a somewhat more searching review on appeal, Kampmeier v. Nyquist, 553 F.2d 296, 299 (2d Cir.1977).
 
 
 23
 To obtain a preliminary injunction Patton was required to show irreparable injury and either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground of litigation plus a balance of hardships tipping decidedly in his favor. See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979).
 
 
 24
 The prospect of irreparable harm is clear on the undisputed facts of this case. Without injunctive relief Patton would begin his 24 months of active naval service immediately, and if his involuntary induction were ultimately found to have been improper, he most likely would have no claim for damages. See 28 U.S.C. Sec. 2680(a) (1982) (excluding from general waiver of sovereign immunity "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation"); see also Dalehite v. United States, 346 U.S. 15, 26-27, 73 S.Ct. 956, 963, 97 L.Ed. 1427 (1953). Even assuming arguendo that such a claim might lie, monetary damages for the resultant loss of liberty would not only be difficult to ascertain, but would, in any event, constitute inadequate recompense.
 
 
 25
 Although the district court did not expressly analyze the merits of this case, defendants urge us to affirm the decision below, arguing that the relevant statutory and regulatory provisions mean calendar years. Defendants' argument for clear statutory meaning, however, is unpersuasive, especially since they have thus far offered three different views on paragraph 1(j)'s temporal criterion: (1) the academy's publications are phrased in terms of academic years, (2) the statute, regulations, and service obligation agreement refer to years of attendance, and (3) in her brief and at oral argument defendants' counsel argued in terms of years of enrollment. Significantly, each view would produce a different result as to when Patton's option to resign from the academy without obligation would expire: under the first view, upon completion of his sophomore year; under the second, either mid-July 1984 (two calendar years from first attending the academy), or perhaps sometime in November 1984 (24 months of actual attendance, taking into account breaks between semesters and Patton's suspension); and under the third view, June 1984 (two calendar years from enrollment).
 
 
 26
 These divergent views alone demonstrate that the paragraph 1(j) language is inherently ambiguous and requires construction, which brings us to the underlying issue: whether interpretation of Patton's service obligation agreement is governed by principles of statutory construction or contract law. While other courts, in construing an analogous enlistment provision applicable to the United States Naval Academy, 10 U.S.C. Sec. 6959, have basically conducted a statutory analysis, see Dougherty v. Lehman, 688 F.2d 158, 161-64 (3d Cir.1982); Wimmer v. Lehman, 705 F.2d 1402, 1407-08 (4th Cir.), cert. denied, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983); Green v. Lehman, 544 F.Supp. 260, 264 (D.Md.1982), aff'd, 744 F.2d 1049 (4th Cir.1984), the midshipman's execution of an agreement was nevertheless a significant analytical factor in such cases, see Green, 544 F.Supp. at 263 (mandatory enlistment provision an implied term of agreement midshipman signed); cf. Wimmer, 705 F.2d at 1403 (midshipman signed "extensive document" regarding understanding of Navy's anti-drug abuse policy, including separation from academy for violation).
 
 
 27
 We find untenable the notion that congress would require Patton to sign a service obligation agreement, but would then cast aside all traditional guidelines for determining meaning and fairness in enforcing his contractual obligation. If Patton's agreement to the terms of his service obligation was required to enroll him in the academy, then the mutual intent of the parties, and not solely the legislative history of the underlying statute, must be relevant in interpreting that agreement. Indeed, whether we label the academy's pre-execution statements made in its publications and at the contract-signing session a manifestation of its intent in signing the service obligation agreement or an administrative agency's construction of an inherently ambiguous statutory/regulatory scheme, the result is the same. Cf. Dougherty, 688 F.2d at 161 n. 2.
 
 
 28
 If Patton's proffered evidence stands up at trial, the academy--whose view in this instance "is entitled to considerable deference", Chemical Manufacturers Association v. Natural Resources Defense Council, Inc., 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985)--undertook to interpret for its students the meaning of paragraph 1(j), and in doing so clearly adopted the academic year concept. The academy thereby led Patton to conclude that his contract, which incorporates the statute, granted him the option to resign from the academy, without incurring any service obligation, at any time before becoming a second classman, or junior.
 
 
 29
 That interpretation is strengthened by the relevant legislative history, which states that the "[involuntary service] obligations do not become effective until a student has completed two years of study. Thereafter, if such a student fails to complete the course of instruction, such individual may be ordered to active duty in the U.S. Navy for two years." H.R.Rep. No. 1139, 96th Cong., 2d Sess. 16, reprinted in 1980 U.S. Code Cong. & Ad. News 4246, 4251 (emphasis supplied). Thus, although not definitive, the legislative history, by emphasizing completion of studies, tends to support plaintiff's argument for academic, rather than calendar years.
 
 
 30
 Absent any contrary evidence in the record, Patton seems to have established a likelihood of success on the merits. At the least, he has made an adequate showing of sufficiently serious questions going to the merits to make them a fair ground of litigation, and, balancing the hardships confronting the parties, Patton's prospect of involuntary naval service clearly outweighs defendants' temporary loss of the services of one able-bodied seaman. Accordingly, the preliminary injunction should issue.
 
 
 31
 We wish to make clear that our holding is not intended to broaden the limited circumstances under which the federal government may be estopped by the conduct of its employees. See, e.g., Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) (government may not be estopped on same terms as any other litigant); Hanley v. Donovan, 734 F.2d 473, 476 (9th Cir.1984) (equitable estoppel should be applied against the government with utmost restraint); cf. United States v. RePass, 688 F.2d 154, 158 (2d Cir.1982) (equitable estoppel as a defense is not available against U.S. except in the most serious circumstances).
 
 
 32
 We perceive Patton's claim as one for breach of a statutorily prescribed contractual provision, for which he seeks an equitable remedy, rather than one based upon the doctrine of equitable estoppel. A claim for equitable estoppel typically involves a situation in which an employee of an administrative agency incorrectly represents the law in rendering advice to a citizen who relies on that representation to his detriment. See, e.g., Schweiker v. Hansen, 450 U.S. 785, 786, 101 S.Ct. 1468, 1469, 67 L.Ed.2d 685 (1981) (per curiam); Graff v. Commissioner, 673 F.2d 784, 785-86 (5th Cir.1982) (Brown, J., concurring). Here, by contrast, Patton alleges that the academy's officers accurately expressed to him the interpretive policy of the academy, as reflected in the academy's publications--interpretations that are apparently supported by the statute's legislative history and certainly not contrary to any clear statutory directive. Finally, these statements were not merely offered to Patton as advice, but, given the circumstances, were instead intended to be a manifestation to his entire class and, indeed, to all prospective applicants, of the academy's interpretation of the governing statutory/regulatory framework, and the academy's intent in entering into the service obligation agreement.
 
 
 33
 B. The Dismissal of the Complaint.
 
 
 34
 While a district judge is empowered to dismiss a complaint sua sponte for failure to state a claim, see Leonhard v. United States, 633 F.2d 599, 609 n. 11 (2d Cir.1980), cert. denied, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981), it is appropriate to do so only when, construing the allegations in the complaint in a light most favorable to plaintiff, it appears beyond doubt he can prove no set of facts in support of the claim that would entitle him to relief, see Goldman v. Belden, 754 F.2d 1059, 1065 (2d Cir.1985) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957) (footnote omitted)); Dahlberg v. Becker, 748 F.2d 85, 88 (2d Cir.1984) (same), cert. denied, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985).
 
 
 35
 Here, the complaint set forth a legally sufficient claim for injunctive and declaratory relief. Indeed, if Patton's allegations are true, his claim has substantial merit. Accordingly, we conclude that the district court abused its discretion in dismissing the complaint.
 
 CONCLUSION
 
 36
 Given the procedural posture of this case, we are not, of course, finally deciding that paragraph 1(j) must be interpreted as referring to academic as opposed to calendar years. We do not know the truth of Patton's affidavits, and there is no solid record regarding the content of the academy's publications at the time Patton applied for admission. If the facts as they appear in the limited record available to us on this appeal were established after a full hearing, we would not hesitate to conclude that the two-year provision of paragraph 1(j), whether viewed under a statutory or contractual analysis, refers to academic years. But, in fairness to the government, such a determination should not be made without the opportunity to develop a fuller record after appropriate discovery.
 
 
 37
 Although reversal of an order denying an application for a preliminary injunction is customarily accompanied by a directive that the district court conduct a new hearing on remand, an appellate court, on a finding of merit in plaintiff's case, can in the alternative direct the district court to issue the injunction. See Charles v. Carey, 627 F.2d 772, 776 (7th Cir.1980); 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2962, at 638 (1973). Because we have found this case "clearly demanding" preliminary injunctive relief, Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc., 601 F.2d 48, 59 (2d Cir.1979), and because Patton's complaint states a proper claim for injunctive and declaratory relief, we reverse the judgment below and remand the matter to the district court with instructions to reinstate the complaint, to issue a preliminary injunction preventing defendants from inducting Patton during the pendency of this action, and to conduct such further proceedings as may be appropriate.
 
 
 38
 We are confident that in considering the case on remand the district judge will be able to put aside the apparent predispositions he revealed when the original injunction application came before him on short notice, and that aided and enlightened by this opinion, he will fairly and judiciously evaluate the claims, issues, and evidence to be developed in the further proceedings.
 
 
 39
 Reversed and remanded.